Muriel Anita **CALDWELL,**
**et al., Plaintiffs,**

v.

**SERVICEMASTER CORPORATION,**
**and Norrell Temporary Services,**
**Defendants.**

**Civil Action No. 95–0533(JHG).**

United States District Court,
District of Columbia.

June 12, 1997.

James Brewster Hopewell, Riverdale, MD, for Plaintiffs.

Lawrence C. DiNardo, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, Karla Grossenbacher, Washington, DC, for defendant Servicemaster Corp.

Jonathan Richard Mook, Ogletree, Deakins, Nash, Smoak & Stewart, Washington, DC, Jon M. Gumbel, Leanne Groce, Ford & Harrison, L.L.P., Atlanta, GA, Joshua Moses Javits, Washington, DC, for defendant Norrell Temporary Services.

## *MEMORANDUM OPINION AND ORDER*

JOYCE HENS GREEN, District Judge.

Presently pending are the defendants' motions for summary judgment. For the reasons stated below, Norrell Temporary Services' motion will be granted and ServiceMaster Corporation's motion will be granted in part and denied in part.

### I. Background

Except where otherwise noted, the following material facts are not in dispute. Plaintiffs, Muriel Anita Caldwell ("Caldwell"), Malika Haynes–Bey ("Haynes–Bey"), Tawanda Morris ("Morris") and Juanita Maria Nur ("Nur"), four African American women, have filed this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1994), and the Civil Rights Act of 1870, 42 U.S.C. § 1981 (1994), against Defendants ServiceMaster Corporation ("ServiceMaster") and Norrell Temporary Services ("Norrell"). In a 16–count Complaint, Plaintiffs allege that ServiceMaster discriminated against each of them in violation of Tile VII based on their race and sex (Counts 1–4); that ServiceMaster's agents unlawfully retaliated against them (Counts 5–8); that Norrell

discriminated against each of them by failing to correct the discriminatory environment that existed at ServiceMaster or to address the adverse actions taken against each Plaintiff by ServiceMaster and its agents (Counts 9–12); and that ServiceMaster discriminated against each Plaintiff in violation of 42 U.S.C. § 1981 (Counts 13–16).[1]

On or about April 1, 1993, Defendant ServiceMaster was hired by the District of Columbia Public School system ("DCPS") to provide construction-related services. ServiceMaster opened an office in the District of Columbia, staffed its new office with managerial personnel and, on June 28, 1993, it entered into a contract with Defendant Norrell to obtain additional employees.

Norrell provides personnel, recruiting and related employment services, and it agreed to do so for ServiceMaster based upon a "Payrolling Services Agreement." Under the terms of this agreement, Norrell would recruit and place employees with ServiceMaster and, using ServiceMaster's funds, would provide payroll services. The Payrolling Services Agreement provided, in relevant part:

> The parties acknowledge that Norrell shall have responsibility to control *all* terms and conditions for the Payrolled Workers *except those that are the responsibility of Client. Client shall have the responsibility to supervise, counsel. discipline, review and evaluate the Payrolled Workers . . . .*
> The Client *reserves the right to request the removal* and/or replacement of any Payrolled Worker *for any lawful reason.*

Payrolling Services Agreement at ¶ 5, attached to Norrell's MSJ at Ex. A (emphasis added).

The relationship between ServiceMaster and Norrell is contractual. While ServiceMaster has an ownership interest in Norrell, that interest is only a minority interest (approximately 29 percent) and "each Company is completely separate with regard to operations." Plaintiffs' Opp. to ServiceMaster's MSJ at Ex. 10; Caldwell Dep. TR at 81,

attached to Plaintiffs' Opp. to Norrell's MSJ at Ex. 1. The defendants do not share the same space or facility nor do they have the same managers or directors.

Pursuant to the Payrolling Services Agreement, Norrell placed Plaintiffs with ServiceMaster. On July 6, 1993, Plaintiffs Caldwell and Morris were assigned to ServiceMaster to perform clerical and administrative services in connection with the DCPS project. On August 2, 1993, Plaintiff Nur was assigned to ServiceMaster to work at the DCPS project as a customer service representative. And, on August 3, 1993, Plaintiff Haynes–Bey was assigned by Nortell to work for ServiceMaster in connection with taking inventory at various schools and as a customer service representative on the DCPS project. Plaintiffs were told by both ServiceMaster and Norrell that they would be hired for a thirteen-week probationary period, after which, at the option of ServiceMaster, they could be hired as full-time employees in the same positions.

The ServiceMaster manager at the DCPS worksite was Mr. Randy Ledbetter and the office manager was Ms. Bonnie McClun, both of whom exercised supervisory responsibilities over Plaintiffs Caldwell and Morris. Ledbetter appeared to have overall supervisory responsibility for all of the employees, including Plaintiffs. While Plaintiff Haynes–Bey performed inventory work at the schools, which comprised a substantial part of her work while with ServiceMaster (ten of fifteen work days), she generally worked under the direction of Ron Fisher, another ServiceMaster manager at the DCPS worksite. For the other five days of her fifteen-day tenure, Haynes–Bey worked at the ServiceMaster office site doing typing for Ron Fisher and under the supervision of McClun. (ServiceMaster disputes whether Haynes–Bey ever worked for McClun. For the purposes of these motions, such dispute is not material.)

Like Haynes–Bey, Plaintiff Nur spent the first two-to-three weeks of her eight week

---

1. As Defendants point out, the Complaint is not specific about the legal basis of Counts 5–8 (retaliation) and Counts 9–12 (discrimination allegations against Norrell). Because of the structure of the Complaint and the fact that Plaintiffs have not identified another legal basis, the Court construes these eight counts as being based on Title VII.

te;.ure with ServiceMaster working at the schools in connection with the DCPS contract and the last five-to-six weeks at ServiceMaster's office working under the direct supervision of Plaintiff Caldwell. Like Caldwell, Nur also worked under the supervision of Ledbetter and McClun. Although the parties do not make clear his precise responsibilities, Mr. Richard Skoff was also a manager at the DCPS office site and appears to have played a role in some of ServiceMaster's personnel decisions.

The record paints a picture of an office in its infancy. Plaintiffs were hired shortly after ServiceMaster entered into the DCPS contract and shortly after it opened its office. According to Caldwell, at the outset, approximately 25 persons were assigned to one small office. Ledbetter was responsible for not only supervising ServiceMaster's performance under the new contract, but also for hiring personnel (through Norrell) and for supervising the remodeling and opening of the office at ServiceMaster's DCPS worksite. During this time period, the record reflects tension between ServiceMaster managers and Plaintiffs as well as between other ServiceMaster employees and Plaintiffs.

Although the defendants reserved the right to contest the truth of the following allegations, for the purposes of the summary judgment motions, they are willing to, assume, as will the Court, that the following allegations are true. *See* ServiceMaster's Statement of Material Facts as to Which There is No Genuine Dispute at 3 n. 2.

**A. Haynes-Bey's allegations.**

During her fifteen-day tenure with ServiceMaster, Haynes–Bey contends that:

1. McClun called her "girl," "gal" and "rascal," rather than calling her by her name;

2. That she was called one of the "Uh Huh girls";

3. That other employees, an Asian male and two White males, were treated differently in that they were given company cars to travel from work to the schools while she was required to use her own car and in that she was reprimanded for being late, while the summer interns,[2] who were also late, were not reprimanded;

4. That while she was terminated for sleeping at the computer, another employee (a White male) was not, even though this was brought to McClun's attention;

5. That when she first arrived at the DCPS worksite, two ServiceMaster managers had difficulty pronouncing her name and she was asked why she did not have a normal name;

6. That while she was in her second week of work with ServiceMaster (and before she had worked in the office where McClun also worked) she attended a meeting between Ledbetter, Skoff, McClun and the other Plaintiffs regarding complaints about McClun's communication skills. Haynes–Bey testified at her deposition that she did not have a complaint at that time.[3] (In her deposition, Haynes–Bey

---

2. Although the identification of the summer interns' race and gender may be buried somewhere in the volumes of attachments filed by the parties, their race and gender has not been made apparent to the Court. For the purposes of this motion, the Court allows the plaintiffs the reasonable inference that the summer interns were of a different race and gender than that of the plaintiffs.

3. Haynes-Bey's deposition reflects the following:
Q: All right. So let's go back now to the meeting where the seven of you are assembled where you and the others asked for a meeting about Bonnie [McClun].
What do you remember was said in that meeting?
A: There were complaints about—there were complaints about Bonnie, I guess, improperly

communicating to—communicating such information to us.
Q: Do you remember who made the complaints?
A: It was Juanita.
Q: What complaints did you make.
A: Actually, at that time I didn't have a complaint.
Q: What complaint did Juanita make?
A: I'm not sure what complaint. The complaints were in regards to Bonnie.
Q: What about?
A: In reference to Bonnie.
Q: What about Muriel Caldwell, do you remember any complaints she may have had?
A: She made complaints. I'm not exactly sure what she said.
Q: Do you remember anything that Bonnie may have said during the meeting?

testified that she could recall no one–on–one conversations with McClun and never had any discussions with Skoff.);

7. That she found Ron Fisher's dissatisfaction with her work performance (i.e., typing errors) objectionable ("I got offended because he said also that I don't understand why can't you do this without making any errors." Dep. at 82).

See Haynes–Bey' EEOC Affidavit ("Aff.") (unsigned, bearing EEOC date stamp of Nov. 9, 1993), attached to Plaintiffs' Opp. to ServiceMaster's MSJ at Ex. 3; Haynes–Bey Deposition (May 23, 1996), attached to ServiceMaster's MSJ at Ex. A; Norrell's MSJ at Ex. G; Plaintiffs Opp. to Norrell's MSJ at Ex. 2; and Plaintiffs' Opp. to ServiceMaster's MSJ at Ex. 12.

In her deposition, Haynes–Bey testified that, prior to her reassignment from ServiceMaster, she had never complained to Norrell staff regarding the allegations described above. Haynes–Bey Dep. TR at 144–45, attached to Norrell's MSJ at Ex. G. On or about August 24, 1993, after only fifteen work days of employment at the ServiceMaster site, she received a call from Jill Pierce at Norrell, advising her that while she was not being terminated by Norrell, she would no longer be needed at the ServiceMaster site.[4] Id. at 145–46.[5]

After Haynes–Bey's termination, Norrell met with ServiceMaster staff to discuss the basis for the termination. See Pierce Dep. TR at 80–81. ServiceMaster reiterated its previous reasons. See Pierce Aff. ¶ 2, attached to Norrell's MSJ at Ex. N. Less than a week later, on August 30, 1993, Norrell placed Haynes–Bey at the World Bank in Washington, DC. Id. at 17. Haynes–Bey voluntarily left her assignment at the World Bank in September of 1993, less than a month after she was assigned, and she did not request further placement by Norrell. Id. at 25.

On or about Nov. 9, 1993, Haynes–Bey filed a complaint with the EEOC alleging that she had been discriminated against by being discharged because of her race (Black), and retaliated against because she complained to the Divisional Manager, Randy Ledbetter (white) about practices that are unlawful under Title VII. EEOC Complaint, attached to Plaintiffs' Opp. to ServiceMaster's MSJ at Ex. 5; id. at Ex. 3 (EEOC Aff.). Following an investigation in which the EEOC concluded that the evidence did not

---

A: No, I don't.
Q: Anything that may have been said by Ledbetter?
A: Yes.
Q: What did he say?
A: He said that—well, someone had mentioned the issue about Bonnie, and he was not going to address it. He said something to the effect that he was not going to address the issue.
Q: What issue was that?
A: The complaints from Bonnie, that we were going to get along. We would have to work together and get along.
Q: Was there a specific issue raised about Bonnie?
A: The treatment and the way that she would talk to—the way she talked, yeah.
Q: And Ledbetter said, I'm not going to deal with, you're all going to get along?
A: That's what he said, pretty much.
Q: Anything else you remember that he may have said?
A: I don't recall anything else.
Haynes-Bey Dep. TR at 70–72.

4. Pierce testified that Haynes–Bey's reassignment was made in response to a telephone call from Ron Fisher, who complained about

Haynes–Bey's communications skills, performance and conduct (sleeping on the job). See Pierce Dep. TR at 85 & Dep. Ex. 3, attached to Norrell's MSJ at Ex. D.

5. Norrell's contemporaneous records regarding Haynes–Bey include the following entries:

Aug. 24, 1993: Ron Fisher "asked us to replace her, not communicative enough, at times displayed poor attitude, even hostility. Didn't proof work, expected Ron to do that for her, seems like she has some sort of personal problem right now. Caught her asleep this a.m., came in at 8:00, but found her at 8:20 asleep in her car."

Aug. 25, 1993: "Spoke to [Haynes–Bey] last nite (sic) about being terminated from this assign (sic), but not from Norrell. She felt okay about that, but it took awhile for it to sink in. She didn't say anything about her treatment being 'unfairly' (sic) (my words), but did say that Ron Fisher was lying about her performance, she didn't seem to be able to back up her statement w/facts & I think she was upset w/me because she felt I was taking his side, none of the other employees['] names came up in the conversation."

Ex. 3 to Pierce Dep. TR, attached to Norrell's MSJ at Ex. D.

prove her claim, she received her right-to-sue letter. *See* Ex. 2 to Haynes–Bey Dep. TR, attached to ServiceMaster's MSJ at Ex. A; ServiceMaster's Statement of Material Facts Not in Dispute at 4, ¶ 13; Plaintiffs' Response to ServiceMaster's Statement of Material Facts Not in Dispute ("Plaintiffs' Response") at 2, ¶ 13 ("Agreed.").

## B. Morris' allegations.

During her tenure with ServiceMaster from July 6, 1993, to August 25, 1993, Morris performed general secretarial work. From July 6, 1993 until approximately August 2nd, she worked under the supervision of Ledbetter and thereafter under the supervision of McClun and Skoff. Morris alleges the following:

1. That after Skoff took a phone call from his sister informing him that she was pregnant, Morris overheard him say that he "could not understand how these young ladies could get knocked up and not get married to these men." Morris Dep. TR at 115, attached to ServiceMaster's MSJ at Ex. B. Morris testified that Skoff did not know that Plaintiff Morris was pregnant, *id.* at 116, and that he was not directing this comment to her or anyone else in specific. *Id.* at 118;

2. That she overheard a white male employee ask Plaintiff Caldwell if she brought fried chicken to eat with her watermelon. Morris Dep. TR at 133;

3. That she was struck by a door opened by Skoff, who did not know she was behind the door when he opened it. Morris Dep. TR at 159–60;

4. That she was called "rascal," "girl," "gal," by McClun, rather than being called by her name. Morris Dep. TR at 142 & 181;

5. That McClun "was not used to working with black people." Morris Dep. TR at 142;

6. That Plaintiffs were called "you people." Morris Dep. TR at 182;

7. That McClun did not "make [her] do more difficult tasks than non[b]lacks because of [her] race," Morris Dep. TR at

143, but that she was treated more harshly than non-Black employees by being required to sign a timesheet. Morris Dep. TR at 143–44;

8. That she overheard racial comments regarding her name, that a white male had stated that Blacks have rhythm, and that a summer employee had laughed when the other Plaintiffs were called the "Uh Huh girls." EEOC Aff. at 2, attached to Plaintiffs' Opp. to ServiceMaster's MSJ at Ex. 4;

9. That at a meeting where Plaintiffs raised the issue of McClun's actions, Skoff became angry and hit his fist on the table, refusing to address the "race problem." Morris Dep. TR at 119;

10. That "[a]nother reason [she] believe[s] [she] was fired [was] because [she] complained to Eddie Edwards (Black) the day before, 8/24/93, about the way [she] was being treated." EEOC Aff. at 2.

As did Haynes–Bey, Morris testified that during her tenure with ServiceMaster, she never complained to Norrell about the allegations detailed above. Morris Dep. TR at 217, attached to Norrell's MSJ at Ex. H. On August 25, 1993, she was terminated. Jill Pierce testified that she was advised that Skoff terminated Morris due to performance and insubordination. Ex. 4 to Pierce Dep., attached to Norrell's MSJ at Ex. D; *see* Morris Dep. TR at 219–20, attached to Norrell's MSJ at Ex. H; Morris Dep. TR at 176, attached to Plaintiffs' Opp. to Norrell's MSJ at Ex. 3.

While the parties do not dispute that Morris took issue with the specific points identified by Skoff to justify her termination, they do dispute whether Morris complained to Norrell of discrimination when Pierce spoke with her on or about August 25, 1993.[6] *Compare* Norrell's Statement of Undisputed Facts (citing Morris Dep. TR at 217–20) *with* Plaintiffs' Opp. to Norrell's MSJ at 5 (citing Caldwell Dep. TR at 122–24 and 205–08).

After Morris' termination, Norrell met with ServiceMaster staff to discuss the basis for the termination. *See* Pierce Dep. TR at 80–81. ServiceMaster reiterated its previous

---

**6.** This dispute is not material. *See infra* Part II.A.

reasons. *See* Pierce Aff. ¶ 2, attached to Norrell's MSJ at Ex. N. Norrell later contacted Morris twice, offering her positions. *See* Morris Dep. TR at 187–88, attached to Norrell's MSJ at Ex. H. Morris refused both offers and never contacted Norrell for employment. *Id.* at 188; Pierce Dep. TR at 159.

On October 4, 1993, Morris filed a complaint with the EEOC, contending that she had been discriminated against because she was Black and pregnant, and she claimed that she had been retaliated against because she opposed unlawful practices under Title VII. *See* Complaint of Discrimination, attached to Plaintiffs' Opp. to ServiceMaster's MSJ at Ex. 8; *id.* at Ex. 4 (EEOC Aff.). Following its investigation, the EEOC found no discrimination. *See* Morris Dep. TR at 197, attached to ServiceMaster's MSJ at Ex. B.; ServiceMaster's Statement of Material Facts Not in Dispute at 6, ¶ 11; Plaintiffs' Response at 3, ¶ 11 ("Agreed.").

## C. Nur's allegations.

Plaintiff Nur was employed at the Service-Master site from August 2, 1993, until September 29, 1993, in the capacity as a customer service representative. Nur alleges the following:

1. That when she inquired whether she would be provided with a company car, she was told by a ServiceMaster manager: "What do you people expect me to do about?" Nur Dep. TR at 93–94, attached to ServiceMaster's MSJ at Ex. C.

2. Bonnie McClun referred to Plaintiffs as "girls and gals." Nur Dep. TR at 84, attached to ServiceMaster's MSJ at Ex. C.

3. That because her name was Juanita, McClun asked her whether she was Spanish. Nur Dep. TR at 84, attached to ServiceMaster's MSJ at Ex. C.

4. That when McClun came out of a meeting in which Nur mediated for McClun and Plaintiff Caldwell, the following occurred:

(Nur): So when Bonnie came out, she hugged me. She said thanks for being a mediator and helping us out. She said, this is hard for me. I am not used to being around a lot of black people, a lot of different ethnic groups. She said that where I grew up, she said in college there was only one black—I don't know if it was [her] roommate [or] the whole school.

That part I really cannot remember. But she mentioned one black. And where I grew up, there were not any. She said, "so any time I need your help to help me along with this situation, because this is going to take some getting used to do."

Nur Dep. TR at 86–87, attached to Service-Master's MSJ at Ex. C.

5. That Plaintiffs were called the "Uh-huh Girls" by Ledbetter, but that Nur never said anything because she "thought Randy [Ledbetter] was okay". Nur Dep. TR at 87–89, attached to ServiceMaster's MSJ at Ex. C.

6. That she was treated disparately on the basis of race because she had problems getting reimbursed for her expenses. Nur Dep. TR at 92–94, attached to ServiceMaster's MSJ at Ex. C.

7. That McClun gave Blacks a harder time than non-Blacks. Nur Dep. TR at 95, attached to ServiceMaster's MSJ at Ex. C.

8. That Skoff became angry when Nur left a meeting while the meeting was in progress and refused to open the door when Nur returned ("the Skoff incident"). Nur Dep. TR at 59, attached to Plaintiffs' Opp. to ServiceMaster's MSJ at Ex. 14.

9. That she was fired in retaliation for the Skoff incident. Nur Dep. TR at 75, attached to Plaintiffs' Opp. to ServiceMaster's MSJ at Ex. 14.

10. That although Randy Ledbetter was "okay," he made her uncomfortable with "one reference about [her] breasts." Nur Dep. TR at 75, attached to Plaintiffs' Opp. to ServiceMaster's MSJ at Ex. 14. *See also* Nur Dep. TR at 62, attached to Norrell's MSJ at Ex. F ("I thought [Randy Ledbetter] was a very nice man.") ("I can't really say that I had any personal complaints about Randy.")

On August 19, 1993, Nur stopped by Norrell's office to pick up her paycheck. During her visit, she spoke with two Norrell employees (Melanie Hoffman and Michelle Kessler–

Cobb) and stated that "there was some uncomfortable feeling" at ServiceMaster. Nur testified as follows at her deposition:

> (Nur): And they said, uncomfortable in what male/female, black/white? And I said, I feel some uncomfortable feeling in both areas. And without a blink of any eye, they both said, well, we know for sure that Rich Bird is a racist. I mean, it didn't even take them—they didn't have to think about it.
>
> Q: And who is Rich Bird?
>
> A: I don't know.

Nur Dep. TR at 99, attached to Plaintiffs' Opp. to Norrell's MSJ at Ex. 4.

When Jill (Schwartz) Pierce returned to the office, Hoffman and Kessler–Cobb relayed this conversation to her. Pierce testified as follows:

> I had been out of the office. When I came back in, they told me that Juanita Nur had been in earlier that day and she came to pick up her check but also took the opportunity to speak to them. And they communicated to me, Michelle and Melanie communicated to me, that she had· said that something was going on ServiceMaster but she couldn't put her finger on it.
>
> She felt that she was being spoken to in a strange manner, particularly by Bonnie McClun, but she was very wishy-washy: I really can't put my finger on it; I don't know. And Michelle pressed her: What do you mean by that? Can you be more specific? You know, is it a black-white thing? Is it a male-female thing? What you going for here?
>
> And Juanita said that she wasn't really sure, but she thought it was more of the latter, being the male-female thing. She didn't really want to say anything and she didn't want us to do anything about it. She said don't do anything about it: I don't want to be hasty.
>
> Q: Where does it say that she didn't want you to do any thing about it?
>
> A: Well, she said she didn't want us to say anything hasty. She would get back to us and let us know.

Q: What led you to conclude that she didn't want Norrell to do anything about this?

A: Largely because she didn't give us any information. She didn't say what. She said, you know, I don't know what it is. She gave us no specifics.

Q: What did you do after you received that information?

A: I documented it in the system.

Pierce Dep. TR at 61–63, attached to Norrell's MSJ at Ex. D.

Norrell's contemporaneous records reflect the following entry regarding Nur's visit on August 19, 1993:

> Came in to speak W/MEL & Michele (I wasn't here). She felt "something" has been going on at SCVMASTER, but couldn't put her finger on it. Spoken to in a strange manner, particularly by Bonnie. Asked by MKC if the odd feelings she got were racially oriented or male/female oriented & she felt it was more of the latter. Said she really didn't have any specifics and did feel like minorities seem to say there are black/white issues in the workplace & she didn't want to say anything hasty.

Ex. 6 to Pierce Dep. TR, attached to Norrell's MSJ at Ex. D.

Nur testified in her deposition that this entry is a fair representation of her visit to Norrell on August 19, 1993. *See* Nur Dep. TR at 150–51, attached to Plaintiffs' Opp. to Norrell's MSJ at Ex. 4.

The following week, Pierce contacted Nut to see how things were going at ServiceMaster. Pierce Dep. TR at 64, attached to Norrell's MSJ at Ex. D. Nur did not mention any concerns regarding discriminatory treatment at ServiceMaster. *Id.*

After Haynes–Bey and Morris were terminated from ServiceMaster in late August 1993, Norrell met with ServiceMaster staff. *See* Pierce Aff. ¶ 2, attached to Norrell's MSJ at Ex. N. At that time, Pierce was advised that ServiceMaster had no problems with Nur's performance. *Id.* Pierce then met with Nur and Caldwell. At that meeting, "[n]either Nur' nor Caldwell expressed any concerns regarding any discrimination or

harassment by ServiceMaster." *Id.* ¶ 3; *see also* Norrell's Statement of Material Facts ¶ 33 ("Neither Nur nor Caldwell mentioned anything to Pierce regarding race or gender discrimination during this meeting.").[7]

On September 29, 1993, Nur was told by ServiceMaster manager Bonnie McClun that she had been terminated. Nur Dep. TR at 72–73, attached to ServiceMaster's MSJ at Ex. C. Nur communicated that decision to Norrell. *See id.* at 159. Nur advised Pierce that the "NAACP would be handling this." Pierce Aff. ¶ 6. Pierce contends that this was the first time of which she was aware that any of the Plaintiffs were contending that their terminations from ServiceMaster were based on race. *Id.*

Norrell's contemporaneous records reflect the following entries:

> Juanita called in at 12:00pm today to say that she is getting terminated from the assignment, there was a meeting from (sic) Bonnie & she'll call me later w/details, but did say that "the NAACP will be handling this for all of us." She was obviously upset, I could hear her sobbing.

Ex. 5, Order Comments Window Entry of 9/29/93 (4:56 p.m.), attached to Pierce Dep. TR, Norrell's MSJ at Ex. D.

> Per Bonnie, was a "fiery exit! Her performance issues included: didn't stay @ the phone, was very chatty w/Muriel [Caldwell]. Not productive on down times, she (in her counseling letter) outlined her prime responsibilities & she has objected to doing typing & there was too much sticking knives in other peoples['] back, she was not a team player, but did do wonderfully well when she was on the phones." In addition, Juanita erased disks on the Dbase before she left, but they were, fortunately able to recover the material. Rich told her to "fix the problem and that has meant letting Juanita and Muriel go."

*Id.*, Order Comments Window Entry of 9/30/93 (7:04 p.m.).

On September 30, 1993, Norrell conducted a follow-up inquiry regarding Plaintiffs' terminations, including Nur's. Pierce requested that all four Plaintiffs come to Norrell offices to facilitate its investigation, but Nur refused to meet with her. *See* Pierce Aff. ¶ 7.

On or about October 4, 1993, Teresa Williams of Norrell conducted a conference with ServiceMaster personnel regarding the basis for Nur's discharge. *See* Williams Aff. at 2, attached to Norrell's MSJ at Ex. M. On or about October 5, 1993, Pierce and Williams of Norrell interviewed four other Norrell employees at the ServiceMaster site about their impressions of the work environment. *See* Pierce Dep. TR at 90 & 92, attached to Norrell's MSJ at Ex. D; Pierce Aff. ¶ 8. Three of those employees were black and one was white. *See* Pierce Aff. ¶ 8. "All four interviewees expressed their opinion that the four Plaintiffs were not discriminated against and that the Plaintiffs, not ServiceMaster, had caused the workplace problems." *Id.*[8]

On October 4, 1993, Nur filed a Complaint of Discrimination with the EEOC. *See* Ex. 6 to Plaintiffs' Opp. to ServiceMaster's MSJ. Nur alleged that she was discriminated against because of her race and in retaliation for opposing unlawful employment practices. *Id.; see also id.* at Ex. 2 (EEOC Aff.). After conducting an investigation, the EEOC advised Nur that the preponderance of the evidence did not support her claim of discrimination. *See* Nur Dep. TR at 106 & Ex. 3 (EEOC letter of Dec. 22, 1994), attached to ServiceMaster's MSJ at Ex. C; ServiceMaster's Statement of Material Facts Not in Dispute at 9, ¶ 16; Plaintiffs' Response at 4, ¶ 16 ("Agreed").

On October 6, 1993, Norrell placed Nur at the Baptist Home and later at the Hotel Lombardi, where she accepted permanent employment on October 15, 1993. *See* Nur Dep. TR at 18 & 163, attached to Norrell's MSJ at Ex. F. Nur later reapplied for em-

---

7. Plaintiffs have not disputed this fact.

8. While the statements of the other four Norrell employees assigned to ServiceMaster constitute hearsay (inadmissible for the truth of the matter), they are admissible as to what Norrell believed after conducting those interviews. Fed.R.Evid. 803(3).

ployment with Norrell and she was placed in three (3) more temporary positions. On February 23, 1994, she was discharged from her last position with Ernst & Young for refusing to perform her assigned duties. *See id.* at 18 & 165; Pierce Dep. TR at ex. 5, attached to Norrell's MSJ at Ex. D.

## D. Caldwell's allegations.

During her tenure with ServiceMaster from July 6, 1993, until September 30, 1993, Caldwell alleges the following:

1. McClun told her that she (McClun) came from a small town were there were only a few Blacks and that she (McClun) was afraid of Blacks;

2. That approximately three weeks after McClun starting working with Caldwell, McClun told Caldwell that she was afraid of her;

3. Rather than calling her by her name, McClun called her "rascal," "gal," and "girl;"

4. That McClun told her that it was hard for her (McClun) to bond with Caldwell because she had never worked with and been around black people before;

5. That her supervisor (McClun) had asked her why it had taken her so long at Kinko's;

6. That McClun had told her that she was tired of Caldwell's attitude and that she (Caldwell) could be let go during the 13–week probationary period;

7. Despite her complaints to Ledbetter about these statements [9] by McClun, nothing was done;

8. That McClun confronted her when McClun was told by an unidentified person that Caldwell had complained that the problem between McClun and Caldwell was a "racial matter";

9. Ledbetter called her and other Black females the "Uh Huh girls;"

10. That she was subjected to comments that all Blacks sing, dance and have rhythm;

11. That when she was observed eating watermelon, one ServiceMaster employee asked if she also had brought fried chicken;

12. That she overheard comments made about a Black female who was unmarried and pregnant; [10]

9. The totality of McClun's statements was summed up by Caldwell in her deposition testimony:

Q: How about McClun up until that point in time [September 28, 1993]? Had she made any racial remarks or statements that you felt were inappropriate?
A: Just, I think, the ones I have already told you about—not being able to work with me, not being able to work with me because I was black. It was hard for her. It was hard for her to work in a black environment. It was—
Q: You felt that was a racially inappropriate comment?
A: Yes.
Q: Any other comments by McClun up until that point in time that you felt were racially inappropriate?
A: She referred, you know, to us as girls, rascals. She introduced us one day as rascals.
Q: Let me ask you now specifically. Did you consider referring to you or introducing you as girls or rascals to be racially inappropriate?
A: Yeah, I took it racially. I will put it like that.
Q: And you found it offensive on a racial basis?
A: Yes.
Q: Any other comments about McClun that you took offense to as being racial slurs or racially inappropriate?

A: When the maintenance men came in she considered them thieves, muggers, as she called them. I considered that racial.
Q: Any other comments by her?
A: No.
Caldwell Dep. TR at 117–19, attached to Plaintiffs' Opp. to ServiceMaster's MSJ at Ex. 11.

10. Caldwell testified to the following:

Q: There is an allegation in your complaint at the same paragraph that Ledbetter asked another black female, Tracey Weish (sic), if she were pregnant?
A: Right.
Q: When did that happen?
A: It was one morning. And she said she wasn't feeling well. And he made a comment, was she pregnant? Was another black female pregnant?
Q: You heard Ledbetter say this?
A: She got upset. She cried. She left the building.
Q: Did you ever say anything to Ledbetter about this?
A: No, I didn't.
Caldwell Dep. TR at 137–38, attached to Plaintiffs' Opp. to ServiceMaster's MSJ at Ex. 11.

13. That she was asked whether she was of American Indian or African American heritage; and

14. That only the four Black Plaintiffs were required to sign the sign-in/sign-out sheet.

Affidavit to EEOC Complaint (Nov. 8, 1993), attached to Plaintiffs' Opp. to ServiceMaster's MSJ, at Ex. 1; Caldwell Dep. TR, attached to Plaintiffs Opp. to ServiceMaster's MSJ, at Ex. 11; Caldwell Dep. TR, attached to Plaintiffs Opp. to Norrell's MSJ, at Ex. 1; Caldwell Dep. TR, attached to Norrell's MSJ at Ex. E; Caldwell Dep. TR, attached to ServiceMaster's MSJ at Ex D.

On or about August 26, 1993, Caldwell testified in her deposition that she received a call from Pierce after Morris and Haynes–Bey were terminated. *See* Caldwell Dep. TR at 122, attached to Plaintiffs' Opp. to Norrell's MSJ, at Ex. 1. (Norrell disputes whether this conversation ever took place. *See* Norrell's Reply at 13.) According to Caldwell, Pierce asked her if the allegations of a racially hostile environment made by Morris were true. *See* Caldwell Dep. TR at 123–24, attached to Plaintiffs' Opp. to Norrell's MSJ, at Ex. 1. Caldwell contends that

she told Pierce that Morris' allegations were true. *Id.* at 124.

Following the removal of Haynes–Bey and Morris, Norrell staff met with ServiceMaster staff and later with Plaintiffs Nur and Caldwell. *See* Pierce Dep. TR at 80–81. At the meeting with ServiceMaster, Norrell staff were told that the removals were based on performance issues and that Plaintiffs Nur and Caldwell's performance had been satisfactory as of that date. *Id.* In the meeting with Plaintiffs Nur and Caldwell that followed, neither plaintiff complained to Norrell about any discrimination or harassment by ServiceMaster.[11] *See id.*; Pierce Aff. ¶ 3, attached to Norrell's MSJ at Ex. N.

On September 29, 1993, Caldwell was counseled by McClun regarding her performance. Both sides agree that the meeting was heated, although exactly what was said, as well as the context of those statements, is partly in dispute.[12] During the meeting, Caldwell signed a counseling memorandum regarding her performance.[13] *See* Caldwell Dep. TR at 150, attached to Plaintiffs Opp. to ServiceMaster's MSJ, at Ex. 11. Following the meeting, McClun contacted Jill Pierce at Norrell and advised her that Caldwell had been terminated from the ServiceMaster site for performance-related reasons.[14] Pierce

11. Plaintiffs have not contested whether this meeting occurred or whether Plaintiffs Nur and Caldwell failed to complain of racial discrimination by ServiceMaster at that meeting. *Compare* Norrell's MSJ at 10 ("Neither Nur nor Caldwell mentioned anything to Pierce regarding race or gender discrimination during this meeting.") (citing Pierce Aft.); Statement of Material Facts ¶ 33 ("Neither Nur or Caldwell mentioned anything to Pierce regarding race or gender discrimination during this meeting.") *with* Plaintiffs' Opp. to Norrell's MSJ at 7 (failing to state otherwise or take issue that such meeting occurred); Plaintiffs' Letter of Nov. 29, 1996 (requesting that Court "consider the detailed presentations of facts in their opposition to Norrell's [MSJ]" as Plaintiffs' statement of disputed facts) (filed pursuant to Order of Dec. 3, 1996 [Docket No. 47] ).

12. In connection with a statement made to McClun during the counseling session, Caldwell testified as follows at her deposition:

Caldwell: I said, you have got two minutes.
Q: You said to her you have got two minutes?
A: Yes.
Q: Why did you say that to her?
A: That was all the time I was going to give her. And she said that—I told her—at that

time I said I was going to ask Elton about it because it just wasn't true. And I walked out.

      *     *     *     *     *     *

Q: Did you refuse to continue to meet with Bonnie [McClun] even when she wanted to continue meeting?
A: She didn't necessarily. I told her I was going to give her two minutes. In fact, she said that it wasn't even going to take that long. But she did tell me to sit down. And I didn't.
Q: Yes.
A: And you left the meeting?
Q: Yes.
Dep. TR at 156–57, attached to ServiceMaster's MSJ at Ex. D.

13. An unsigned copy of the counseling memorandum of Sept. 29, 1993, is attached to Norrell's MSJ at Ex D., Ex. 5A to Pierce Dep. TR and to ServiceMaster's MSJ at Ex. D, Ex. 2 to Caldwell Dep. TR.

14. McClun testified in her deposition that Caldwell was terminated because "[s]he was not performing satisfactorily. She had blatantly told me she was not going to report to me, she was not going to do as I had requested her to do; therefore, the relationship, was gone." McClun Dep. TR at 59, attached to Norrell's MSJ at Ex. L.

Dep. TR at 100–01. Caldwell contends that Norrell, through Jill Pierce (who was then Jill Schwartz), relayed this decision to Caldwell. Caldwell Dep. TR at 50.[15]

Norrell's contemporaneous records reflect that it received a call from Caldwell in which she disputed the points raised in the counseling memorandum. The "Employee Maintenance Record" (as recorded by Pierce, *see* Pierce Dep. TR at 75 (identifying herself as "JAS") states the following:

> [Caldwell] called in after Juanita [Nur] left to talk about the counseling session: refuted each point in Bonnie's memo saying that Bonnie was a liar.... At the end, [Bonnie] told her I was invaluable & asked me to sign it, which I did, but I'm going to write her back. Then she said if I can't adhere to this, you know we've hired Tracy & she is very good & very professional. Is this a racial thing, Bonnie asked, but I never mentioned race to her. I told her I intend to be a SVCMSTR empl (sic) and Bonnie said if you do as I tell you to do & don't take it any higher. To me (JAS) Muriel [Caldwell] said that whenever I am challenged, I am argumentative, but I can still ask questions & it doesn't mean she's right & Juanita didn't do anything.

Employee Comment Maintenance, Muriel Caldwell (9/30/93), Ex. 3 to Pierce Dep. TR, Norrell's MSJ at Ex. D.

On September 30, 1993, Norrell conducted a follow-up inquiry regarding the separation of Caldwell and Nur. After interviewing McClun and speaking with both Caldwell and Nur, Pierce determined that while McClun "cited to performance reasons," Plaintiff Caldwell believed race was at issue. Pierce spoke with Caldwell again on October 1, 1993, and requested that all four Plaintiffs come to Norrell offices to facilitate its investigation. Only Caldwell appeared. *See* Caldwell Dep. TR at 214, attached to Nor-

rell's MSJ at Ex. E (Norrell told Caldwell it would investigate her allegations).

On or about October 4, 1993, Teresa Williams of Norrell conducted a conference with ServiceMaster personnel regarding the basis for the discharges of Nur and Caldwell. *See* Williams Aff. at 2, attached to Norrell's MSJ at Ex. M. And, on or about October 5, 1993, Pierce and Williams of Norrell interviewed four other Norrell employees at the ServiceMaster site about their impressions of the work environment. Pierce Dep. TR at 90 & 92, attached to Norrell's MSJ at Ex. D; Pierce Aff. ¶ 8. Three of those employees were black and one was white. *See* Pierce Aff. ¶ 8. "All four interviewees expressed their opinion that the four Plaintiffs were not discriminated against and that the Plaintiffs, not ServiceMaster, had caused the workplace problems." *Id.*[16]

Norrell later placed Caldwell at two other positions: on October 13, 1993, she was placed in a temporary assignment at Discus which ended on November 5, 1993. Immediately thereafter she was placed at Pepco. On March 4, 1994, Caldwell resigned from Norrell to accept a permanent position with Pepco.

On or about October 4, 1993, Caldwell filed an administrative complaint with the EEOC contending that she had been discriminated against because of her race (Black), and that she had been retaliated against because she opposed unlawful practices. Complaint of Discrimination, Plaintiffs' Opp. to ServiceMaster's MSJ at Ex. 7; *id.* at Ex. 1 (Aff. of Nov. 8, 1993). Following an investigation by the EEOC, she received a letter of determination, which stated "the preponderance of the evidence gathered in the EEOC's investigation fail[ed] to prove [her] claim." ServiceMaster's Statement of Material Facts ¶ 7; Plaintiffs' Response at 4, ¶ 7 ("Agreed.").

---

15. Although the record does not make clear who actually advised Caldwell of the decision to terminate her from the ServiceMaster site, Caldwell testified that Jill Pierce "said that Bonnie had called and asked me not to return to ServiceMaster." Caldwell Dep. TR at 50, attached to ServiceMaster's MSJ for Ex. D.

16. While the statements of the other four Norrell employees assigned to ServiceMaster constitute hearsay (inadmissible for the truth of the matter), they are admissible and probative of what Norrell believed after conducting those interviews. Fed.R.Evid. 803(3).

## II. Discussion

Defendant Norrell seeks summary judgment on all counts asserted against it (Counts 9–12), and Defendant ServiceMaster seeks partial summary judgment on the sex discrimination claims contained in Counts 1, 2, 3 and 4; on the racially hostile environment claims by Plaintiffs Haynes–Bey, Nur, and Morris (as contained in Counts 2, 3 & 4); and on the retaliation claims by Plaintiffs Caldwell, Haynes–Bey and Nur (Counts 5, 6 & 8).[17]

Summary judgment is appropriate when there is "no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are any genuine issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The role of the Court on a motion for summary judgment is not to weigh the evidence, but to determine whether genuine issues of material fact exist for trial. *Abraham v. Graphic Arts Int'l Union*, 660 F.2d 811, 814 (D.C.Cir.1981 ). To survive summary judgment, the nonmoving party must offer more than mere allegations, *Anderson* 477 U.S. at 249, 106 S.Ct. at 2510–11, by going "beyond the pleadings and by [her] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If the material facts proffered by the nonmoving party are subject to diverse interpretations, summary judgment is not available.

*Tao v. Freeh*, 27 F.3d 635, 638 (D.C.Cir. 1994). Any doubts must be resolved in favor of the nonmoving party, *Abraham*, 660 F.2d at 815, and the nonmoving party is entitled to all justifiable inferences. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513–14.

### A. Norrell's MSJ.

Conceding that a genuine issue of material fact exists as to whether Norrell is a joint employer, *see* Norrell's Reply at 5, Norrell seeks summary judgment on Counts 9–12, contending that the facts of this case were insufficient to place Norrell on notice of any alleged discrimination by ServiceMaster and that, even if Norrell had notice, it took the appropriate corrective action that was within its control. *Id.* at 6.

■ To prevail on a theory of joint employer liability, a plaintiff must show that the defendant knew or should have known of the discriminatory conduct and that it failed to take those corrective measures within its control. *Powell v. Las Vegas Hilton Corp.*, 841 F.Supp. 1024, 1029–30 (D.Nev.1992); *Magnuson v. Peak Technical Servs., Inc.*, 808 F.Supp. 500, 513 (E.D.Va.1992). To survive a motion for summary judgment, the plaintiffs must identify a genuine issue of material fact. Because here there is no genuine issue of material fact, Norrell's motion for summary judgment will be granted.[18]

■ Simply put, Plaintiffs did not provide Norrell with sufficient notice of discrimination by ServiceMaster. Prior to her termination, Plaintiff Morris did not complain to Norrell about *any* discriminatory treatment on *any* basis by ServiceMaster. Morris Dep. TR at 217–18, attached to Norrell's MSJ at Ex. H ("I didn't see any reason to call Norrell."). Similarly, during her fifteen-day tenure with ServiceMaster, Haynes–Bey failed

17. Defendant ServiceMaster is not seeking summary judgment on the racially disparate treatment claims contained in Counts 1, 2, 3 and 4, Plaintiff Caldwell's racially hostile environment claim contained in Count 1, Plaintiff Morris's retaliation claim in Count 7 or on any of the claims asserted under 42 U.S.C. § 1981 (Counts 13–16).

18. Because the Court is granting Norrell's motion for summary judgment, she does not need to determine whether Norrell could be liable under theories of single employer liability or agency law. However, were the Court to have reached these issues, she would have found for Norrell because Plaintiffs have failed to produce evidence that would establish a genuine issue of material fact regarding either theory and the undisputed facts make clear that Norrell is entitled to judgment as a matter of law.

to complain to Norrell that she was being discriminated against by ServiceMaster or ServiceMaster personnel. Haynes–Bey Dep. TR at 144–45, attached to Norrell's MSJ at Ex. G (Q: "Is my understanding correct that you never specifically called anybody at Norrell and complained about any of those actions?" A: "Yes").

Plaintiffs' notice argument rests on an alleged conversation on or about August 26, 1993, between Caldwell and Norrell's Pierce after Morris was terminated.[19] Nur's vague and tentative comments to Norrell staff on August 19, 1993, and rumors of discriminatory stray comments by ServiceMaster personnel who were not involved in the discriminatory conduct alleged by Plaintiffs.

Even granting Plaintiffs those reasonable inferences to which they are entitled, neither Caldwell's conversation on August 26th nor Nur's ambiguous statement on August 19th were sufficiently specific to expose Norrell to joint employer liability under Title VII. While Nur told Norrell personnel that something funny was going on at ServiceMaster, she made no specific allegations. She did not ask Norrell to take any action, and, in fact, she at least strongly implied that she did not want Norrell to take any action at that time. In her deposition testimony, she agreed that she provided Norrell with no specifics. *See* Nur Dep. TR at 150–51, attached to Plaintiffs' Opp. to Norrell's MSJ at Ex. 4. And, Nur even told the EEOC that when Norrell "asked [her] what [Nur] wanted them to do about [her] complaints, [she] said that [she] wanted to give ServiceMaster a chance to

make the changes they promised." Nur's EEOC Aff., attached to Plaintiffs' Opp. to ServiceMaster's MSJ at Ex. 2. Moreover, it is uncontroverted that when Norrell followed-up with Nur the next week, she did not mention any discriminatory conduct by ServiceMaster. *See* Pierce Dep. TR at 64, attached to Norrell's MSJ at Ex. D.

Nor do the unsubstantiated allegations that other ServiceMaster employees had, in the past, engaged in discriminatory verbal conduct at other worksites provide Norrell with notice of discrimination against these Plaintiffs at the ServiceMaster office, in large part because such allegations involved different persons and different worksites.[20]

Assuming for the purposes of this motion that the conversation on August 26, 1993, between Caldwell and Pierce even took place, it was not specific enough to place Norrell on notice of all of the detailed (and overlapping) allegations in Plaintiffs' sixteen-count Complaint. At most, Caldwell's statement in response to Pierce's question whether a racial atmosphere existed at ServiceMaster (primarily because of the claim that McClun could not work with Blacks), placed Norrell on notice as to the possible discriminatory verbal conduct of McClun. But, the record indicates that, following the (disputed) conversation with Caldwell, Norrell discussed with ServiceMaster the basis for Haynes–Bey and Morris' terminations and determined that ServiceMaster had offered reasons that were fully consistent with The Payrolling Services Agreement.

19. Norrell disputes whether this conversation occurred. While the fact of this conversation is disputed, its existence is not material. Even accepting *arguendo* that it did transpire, it was not sufficiently specific to place Norrell on notice.

20. Plaintiffs contend that two incidents involving other ServiceMaster staff at other sites indicate that Norrell knew or should have known that they were being discriminated against by different ServiceMaster staff at a different site. *See* Plaintiffs' Opp. to Norrell's MSJ at 6 (citing Hoffman Dep. TR). Plaintiffs allege that on August 26, 1993, a foreman used the derogatory word "nigger" to, or in the presence of, a Black worker at a ServiceMaster construction site and that the supervisor's foreman, Rich Byrd, did nothing. *Id.* at 6; Hoffman Dep. TR at 25,

attached to Plaintiffs' Opp. to Norrell's MSJ at Ex. 8; Plaintiffs' Ex. 13 (Norrell Order Comments Window dated Aug. 27, 1993). Plaintiffs also point to a second incident that occurred on or about September 6, 1993, in which a ServiceMaster employee at the George Washington University work site referred to Blacks as a bunch of monkeys. *Id.* at 6; Hoffman Dep. TR at 30, attached to Plaintiffs' Opp. to Norrell's MSJ at Ex. 8; Plaintiffs' Ex. 14 (Norrell Order Comments Window dated Sept. 7, 1993). While Norrell did not ignore these incidents, *see* Plaintiffs' Ex. 14 (describing meeting by Norrell to address "bunch of monkeys" comment), neither are these ugly but isolated incidents involving different actors at different places sufficient to provide Norrell with notice of discrimination against Plaintiffs at ServiceMaster's office.

■ Even had Norrell determined that ServiceMaster had terminated Plaintiffs Haynes–Bey and Morris for an unlawful reason under Title VII, Norrell had no authority under the Payrolling Services Agreement to oversee ServiceMaster or to force it to change its request that Plaintiffs Haynes–Bey and Morris no longer be assigned to the ServiceMaster worksite. By offering positions to Haynes–Bey (who accepted) and Morris (who did not) after ServiceMaster requested that they not return, Norrell took those corrective measures that were within its control.[21]

Similarly, after Caldwell and Nur were terminated and they leveled more specific claims of discrimination against ServiceMaster personnel, Norrell staff interviewed Plaintiff Caldwell (the only one who was willing to talk), certain ServiceMaster personnel and other Norrell temporary employees assigned to the ServiceMaster worksite. As did the EEOC when it conducted its investigation, Norrell did not find proof of discrimination. Nevertheless, as it did for Plaintiff Haynes–Bey and Morris, Norrell offered Plaintiffs Caldwell and Nur reassignment to positions that were substantially similar. While reassigning Plaintiffs was within Norrell's control, changing ServiceMaster's work environment was not. See Payrolling Services Agreement ¶ 5, attached to Norrell's MSJ at Ex. A. ServiceMaster had the right to request the removal or replacement of any "Payrolled Worker for any lawful reason." ServiceMaster did so request and, upon reasonable inquiry, Norrell lacked a sufficient basis from which to conclude that the terminations were other than lawful. In sum, Norrell cannot be exposed to Title VII liability where Plaintiffs failed to provide it with timely, reasonably specific allegations of discrimination. Nor can Norrell be held liable where, once it received reasonably specific

notice, it investigated the complaints and took those actions that were within its control by offering Plaintiffs new assignments (which were accepted by the three of four Plaintiffs).

Summary judgment will be entered in favor of Norrell on Counts 9–12.

**B. ServiceMaster's motion for partial summary judgment.**

### 1. Plaintiffs' claims for sex discrimination.

ServiceMaster seeks summary judgment on the sex discrimination claims contained in Counts 1–4, contending that Plaintiffs Haynes–Bey, Nur and Caldwell failed to exhaust their administrative remedies by including a gender discrimination charge in their EEOC Complaint and that Plaintiff Morris has not identified any evidence of sex discrimination such that a jury could reasonably find in her favor. In opposition, Plaintiffs argue that sex discrimination could be inferred from the conduct alleged in their administrative complaints.

Before a Title VII plaintiff may institute a civil action alleging discrimination, she must file an administrative complaint with the EEOC. *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C.Cir.1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 57, 136 L.Ed.2d 20 (1996). Compliance with the requirement for administrative exhaustion is mandatory, *Brown v. General Services Administration*, 425 U.S. 820, 832–33, 96 S.Ct. 1961, 1967–68, 48 L.Ed.2d 402 (1976); *Bayer v. U.S. Department of Treasury*, 956 F.2d 330, 332 (D.C.Cir.1992), because the administrative charge gives the charged party notice of the claim and it "narrow[s] the issues for prompt adjudication and decision." *Park*, 71 F.3d at

---

**21.** While Plaintiffs contend that Norrell did not offer them comparable employment, they have not pointed to any evidence to support their position and oppose Norrell's motion for summary judgment on this score with bare allegations. *See* Plaintiffs' Opp. to Norrell's MSJ at 7 (merely stating without pointing to any evidence that the other positions "did not pay as well nor did they offer a five year position with an option to extend beyond five years"). Of course, the

position at ServiceMaster was permanent only at ServiceMaster's option, but this is not material for the purposes of this motion. Assuming without deciding that Norrell even had an obligation to offer Plaintiffs comparable employment, Plaintiffs have failed to carry their burden to oppose summary judgment and demonstrate that Norrell did not offer to reassign them at positions commensurate with their skills and at a rate of pay that was substantially equivalent.

907 (quoting *Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429, 472 (D.C.Cir.1976), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978)).

▮ Although a complaint in some manner or in some form must be made administratively, it is well settled that a vaguely worded charge is not fatal to a Title VII plaintiffs case. EEOC complaints are to be liberally construed, because they are often drafted "by persons unschooled in technical pleading." *Shehadeh v. Chesapeake & Potomac Telephone Co.*, 595 F.2d 711, 727 (D.C.Cir.1978). However, "it is also true that the requirement of some specificity in a charge is not a 'mere technicality,'" *Park*, 71 F.3d at 907 (quoting *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1111 (7th Cir.1992) (internal quotation marks omitted)), and a liberal interpretation of an administrative charge cannot be used to "permit a litigant to bypass the Title VII administrative process." *Park*, 71 F.3d at 907.

▮ A claim not included in an administrative complaint is barred under Title VII unless it is like or reasonably related to another claim or other claims that were exhausted administratively. *Park*, 71 F.3d at 907. Other than Morris' complaint, a fair reading of the record fails to reveal that a sex discrimination allegation, in any form, was ever brought to the EEOC's attention by Plaintiffs Haynes–Bey, Caldwell or Nur. An allegation of race-based discrimination does not, by itself, include an allegation of sex discrimination; these allegations are discrete, and they must be identified specifically and separately. *See Rush v. McDonald's Corp.*, 966 F.2d 1104, 1112 (7th Cir. 1992); *Lowe v. City of Monrovia*, 775 F.2d 998, 1010 (9th Cir. 1985), *amended*, 784 F.2d 1407 (9th Cir.1986). *See generally* Lindeman & Grossman, 2 Employment Discrimination Law 1450–51 (3rd ed.1996).

▮ Plaintiffs Haynes–Bey, Nur and Caldwell failed to include claims of sex discrimination in their administrative complaints, and sex discrimination simply is not like or reasonably related to race discrimination or retaliation. Contrary to their argument, the administrative complaints (and supporting affidavits) filed by Plaintiffs Haynes–Bey, Nur and Caldwell do not contain a whisper of sex discrimination. While they contend that a charge of sex discrimination was fairly raised to the EEOC because they complained that Bonnie McClun had used "sexually derogatory remarks such as 'gal' and 'girl,'" *see* Plaintiffs' Opp. to ServiceMaster's MSJ at 7, when deposed Plaintiffs stated that they interpreted those remarks to be *racially* derogatory. *E.g.*, Caldwell Dep. TR at 117–19, attached to Plaintiffs' Opp. to ServiceMaster's MSJ at Ex. 11; Nur Dep. TR at 85, attached to ServiceMaster's MSJ at Ex. C; Morris Dep. TR at 181–82 & 217, attached to ServiceMaster's MSJ at Ex. B; Haynes–Bey Dep. TR at 104, attached to ServiceMaster's MSJ at Ex. A. Similarly, although Plaintiffs point to the phrase "Uh huh girls" as another sexually derogatory term, during their depositions, at least two of them testified that it was a *racially* derogatory phrase. *E.g.*, Haynes–Bey Dep. TR at 95, attached to ServiceMaster's MSJ at Ex. A; Nur Dep. TR at 87.[22]

A fair reading of the administrative complaints and affidavits submitted by Plaintiffs Caldwell, Haynes–Bey and Nur do not even hint that they were complaining about sex discrimination. Since sex discrimination is not like or reasonably related to the charges that they filed regarding race discrimination and retaliation, ServiceMaster's motion for partial summary judgment will be granted on the sex discrimination claims of Plaintiffs Haynes–Bey, Nur and Caldwell.

---

**22.** Perhaps Nur would have had a claim for sex discrimination had she included the alleged remark by Ledbetter regarding her breasts. *See* Nur Dep. TR at 91, attached to Plaintiffs' Opp. to ServiceMaster's MSJ at Ex. 14 (testifying that Ledbetter's remark was made in bad taste, but was not racial; nor did Plaintiff Nur contend that this remark was sexually derogatory). However, she failed to include this allegation in either her administrative complaint or her affidavit to the EEOC, perhaps for the reasons stated during her deposition. *See id.* at 62, attached to Norrell's MSJ at Ex F. ("I thought [Randy Ledbetter] was a nice man.... I can't really say that I had any personal complaints about Randy.").

Summary judgment in favor of the ServiceMaster will also be granted on Plaintiff Morris' claim for sex discrimination.[23] While Morris' claim was administratively exhausted, there is insufficient evidence of gender animus for a jury to reasonably find in her favor. While pointing primarily to a comment made by Skoff that he "didn't understand how these young ladies could get knocked up and not get married to these men," Morris concedes that the remark was not targeted at her (but at Skoff's sister) and that Skoff was unaware that Morris was pregnant. *See* Morris Dep. TR at 115–18. Morris also concedes that Skoff did not know she was behind a door when he opened it and struck her. *Id.* at 161. And, while McClun (a woman) may have used the words "gal" and "girl," consistent with each Plaintiff's testimony, those words were not reasonably construed by Plaintiffs as sexually demeaning. *See* Caldwell Dep. TR at 117–19, attached to Plaintiffs' Opp. to ServiceMaster's MSJ at Ex. II (construed words as racially derogatory); Nur Dep. TR at 85, attached to ServiceMaster's MSJ at Ex. C (same); Morris Dep. TR at 181–82 & 217, attached to ServiceMaster's MSJ at Ex. B (same); Haynes–Bey Dep. TR at 104, attached to ServiceMaster's MSJ at Ex. A (same). Nor does the failure to terminate a white male sleeping on the job provide evidence of disparate treatment based on sex where Morris (a pregnant Black female) was not terminated for sleeping on the job.

Morris' evidence of sex discrimination is thin to the point of invisibility. She has simply failed to carry her burden to survive summary judgment by showing that there is sufficient evidence of sex discrimination to establish a genuine issue of material fact such that a jury could reasonably find in her favor.

**2. Plaintiffs Haynes–Bey, Morris and Nur's hostile environment claims.**

To prove hostile environment under Title VII, a plaintiff must demonstrate that the "workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of employment and create an abusive environment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (internal citations omitted). Determining whether alleged conduct is sufficiently hostile or abusive is based on an objective standard, although if a plaintiff does not consider the environment to be abusive, such conduct has not altered her conditions of employment. *Id.* at 21, 114 S.Ct. at 370. In determining whether an environment is hostile, courts consider the totality of the circumstances, including the frequency of the alleged conduct; its severity; whether the conduct is physically threatening or humiliating or a mere offensive utterance; and whether the conduct unreasonably interferes with an employee's work performance. *Stoeckel v. Environmental Mgt. Sys., Inc.,* 882 F.Supp. 1106, 1114 (D.D.C.1995). Title VII only prohibits discrimination; it does not guarantee employees a pleasant work environment.

The allegations by Plaintiffs Haynes–Bey, Morris and Nur do not demonstrate conduct that is sufficiently severe or pervasive for a jury to reasonably find in their favor. During her fifteen-day tenure with ServiceMaster, Haynes–Bey spent the first week "out in the field." There were only five days in which she interacted in a significant way with the supervisors in ServiceMaster's office. Although Haynes–Bey contends that she was in an environment that was hostile to minorities, the evidence to which she points reflects only comments and conduct that were, at most, rude and offensive.[24] Buttressing this conclusion is the fact

23. In their opposition to ServiceMaster's motion for summary judgment, Plaintiffs did not respond directly to ServiceMaster's argument that Plaintiff Morris had failed to produce sufficient evidence for a reasonable jury to find in her favor.

24. In Plaintiffs' Opposition to ServiceMaster's MSJ at 10, Plaintiff Haynes–Bey points to the following as evidence of a hostile environment: (1) that she saw McClun every day; (2) that she was in an environment controlled by people who were hostile to minorities; (3) that McClun told someone else she was afraid of Black persons. This is simply not enough to survive summary judgment, and her attempt to rely on alleged conduct directed to someone else is rejected. Even including three of Haynes–Bey's other allegations, as identified by Defendant ServiceMaster, *see* ServiceMaster's MSJ at 9, she still has not produced sufficient evidence for a jury to reasonably find in her favor.

that Haynes–Bey never complained to Norrell and, in her deposition, she testified that at the meeting Plaintiffs requested to complain about McClun, Haynes–Bey stated: "Actually, at that time I didn't have a complaint." Haynes–Bey Dep. TR at 11, attached to Plaintiffs' Opp. to ServiceMaster's MSJ at Ex. 12. Where the plaintiff does not subjectively perceive the environment to be abusive, there is no Title VII violation. *Harris*, 510 U.S. at 20–22, 114 S.Ct. at 370.

■ The hostile environment claim of Plaintiff Morris falls for the same reason: she has not produced sufficient evidence for a reasonable jury to find that the conduct to which she was subjected was sufficiently severe and pervasive. Morris points to comments by McClun (calling Plaintiff Morris "girl," "gal," "rascal" or "you people"), a comment directed to someone else regarding fried chicken, evidence that she was inadvertently hit by a door when Skoff exited (not knowing she was on the other side), the requirement to sign-in when non-Blacks were allegedly not required to do so and a stray comment by someone regarding her name. While these remarks and incidents may be construed as being race-related, they do not demonstrate racial animus that is so severe and pervasive as to create a hostile environment under Title VII.

■ Plaintiff Nur fares no better. Nur spent only a portion (19 days) of her Service-Master tenure (of approximately 2 months) in the ServiceMaster office. At most, like Haynes–Bey and Morris, Nur was subjected to conduct that was offensive, but which consisted of sporadic, isolated incidents—none of which could be deemed outrageous when considered alone or even when aggregated. As evidence of a racially hostile environment, Nur offers the comments in which Plaintiffs were called the "Uh Huh Girls" by Ledbetter (about whom Nur had no complaints about, *see supra* n. 22 & *infra* n. 24); contends that she was locked out of a meeting when she left in the middle of it; that she was subject-

ed to the phrase "you people" when Ron Fisher referred to Plaintiffs.[25] ServiceMaster points to other comments such as McClun's statements that she was not used to working around Blacks, that McClun gave her a "hard time," that McClun asked her if she was Spanish because her first name was Juanita, and that Ron Fisher responded to a question about whether Nur and Haynes–Bey would get a company car with the statement: "what to do you people expect me to do about it?" Contrary to Plaintiffs' contentions, these comments and incidents do not describe a hostile environment under Title VII. At most, the comments are rude and insensitive. They are not, however, sufficiently pervasive and severe to establish a racially hostile environment under Title VII as a matter of law.

Summary judgment will be entered in favor of Defendant ServiceMaster on the hostile environment claims of Haynes–Bey, Morris and Nur.

### 3. The retaliation claims of Plaintiffs Haynes–Bey, Caldwell and Nur.

To make out a *prima facie* case of retaliation under Title VII, a plaintiff must demonstrate (1) that he or she engaged in a statutorily protected activity; (2) that the employer was aware of such activity; (3) that the employer took an adverse action against them; and (4) that there is a nexus between the protected activity and the adverse action. *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C.Cir.1984). *See generally* 1 Lindeman & Grossman, Employment Discrimination Law, *supra* at 650. Once the employer has articulated a legitimate, non-discriminatory reason for the discharge, the plaintiff must prove by a preponderance of the evidence that the articulated reason was not the real reason but was a pretext for retaliation.

■ ServiceMaster seeks summary judgment on these claims, contending that Plaintiffs Haynes–Bey, Caldwell and Nur failed to

---

25. Nur also contends that Ledbetter made a comment about her breasts. *See* Plaintiffs' Opp. to ServiceMaster's MSJ at 13–14 & Nur Dep. TR at 91. While this allegation may be probative of sex discrimination in a timely filed, properly exhausted charge, it is not probative of racial animus. Moreover, for whatever reason, while the comment made her uncomfortable, she did not allege a sexually hostile environment. *See* Nur Dep. TR at 62, attached to Norrell's MSJ at Ex. F (Ledbetter was a "very nice man" about whom Nur had no complaints).

show that they engaged in protected activity under Title VII and that they have failed to establish a causal connection between the adverse action and the protected activity. ServiceMaster's motion will be denied. Plaintiffs have offered evidence that they requested a meeting with Ledbetter to complain about the treatment that they had received from McClun. Later, McClun approached Caldwell, stating that she had been told that Caldwell said that the problems with between them were based on race. This creates a genuine issue of material fact whether Plaintiffs complained to Ledbetter about McClun's alleged unlawful employment practices, *see, e.g.,* Caldwell Dep. TR at 78, 80 & 84–85,[26] and whether they were later terminated in retaliation for those complaints. This is cognizable under Title VII, *see* 1 Lindeman & Grossman, Employment Discrimination Law, *supra* at 650 & 655–57, and Plaintiffs' deposition testimony is sufficient to create a genuine issue of material fact as to both. Therefore, ServiceMaster's motion for summary judgment on the retaliation counts will be denied.

### III. Conclusion

Accordingly, it is hereby

**ORDERED** that Defendant Norrell's motion for summary judgment is granted; in accordance with Fed.R.Civ.P. 58, judgment will be entered separately in favor of Norrell as to Counts 9 through 12; it is

**FURTHER ORDERED** that Defendant ServiceMaster's motion for summary judgment is granted in part and denied in part. ServiceMaster's motion will be granted as to Plaintiffs Caldwell, Nur, Haynes–Bey and Morris' claims of sex discrimination in Counts 1 through 4; it will be granted as to Plaintiffs Haynes–Bey, Nur and Morris' hostile environment claims in Counts 2, 3 and 4; and it will be denied as to the retaliation claims of Plaintiffs Caldwell, Nur and Haynes–Bey in Counts 5, 6 and 8. Accord-

ingly, Judgment will be entered separately in favor of ServiceMaster; and it is

**FURTHER ORDERED** that a status/settlement conference will be set for **June 27, 1997 at 9:15 a.m.** to set dates for the pretrial conference and the jury trial on the remaining issues. Prior to the status/settlement conference, counsel for Plaintiffs and counsel for ServiceMaster are to meet and confer regarding the possibility of settling those counts that remain. Should this matter not be settled prior to the status/settlement conference, counsel shall be prepared to continue the settlement discussions at the status/settlement conference on June 27th. If settlement discussions are necessary on June 27th, counsel shall ensure that they have direct and immediate access to their principals, by telephone or otherwise, in order to facilitate settlement.

IT IS SO ORDERED.

---

26. While it is not entirely clear that Plaintiffs complained to Ledbetter of *discriminatory* treatment *based on race,* Caldwell testified that McClun approached her (after Caldwell met with Ledbetter) and "said that someone had made a comment to her that it was a racial matter between us." Caldwell Dep. TR at 92. Of course,

Plaintiffs' activity under Title VII is protected only if their complaint to Ledbetter about McClun involved allegations of illegal discrimination—not if it involved mere criticism of McClun's communication skills or her alleged inability to get along with Plaintiffs.